# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

David E. Stout,                          :

                 Petitioner    :

                              :

            v.               :    No. 426 C.D. 2021

                              :    Submitted: October 22, 2021

Unemployment Compensation   :

Board of Review,             :

                 Respondent   :

**BEFORE:**    **HONORABLE RENÉE COHN JUBELIRER,** Judge[1]
                   **HONORABLE ANNE E. COVEY,** Judge
                   **HONORABLE CHRISTINE FIZZANO CANNON,** Judge

**OPINION NOT REPORTED**

**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**            **FILED: March 21, 2022**

David E. Stout (Claimant) petitions for review of a March 23, 2021 Order of the Unemployment Compensation (UC) Board of Review (Board), affirming the decision of a Referee that found Claimant ineligible for UC benefits pursuant to Section 402(b) of the Unemployment Compensation Law (Law)[2] because Claimant voluntarily quit his employment without cause of a necessitous and compelling nature. Because the totality of facts does not establish, as a matter of law, that

---

[1] This case was assigned to the opinion writer before January 7, 2022, when Judge Cohn Jubelirer became President Judge.

[2] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(b). Section 402(b) provides that "[a]n employe shall be ineligible for compensation for any week" "[i]n which his unemployment is due to voluntarily leaving work without cause of a necessitous and compelling nature . . . ." *Id.*

Claimant had a conscious intent to voluntarily terminate his employment, and as this was the only reason the Referee found Claimant ineligible for UC benefits, we reverse the Board's Order.

## I. BACKGROUND

Claimant was employed by Symphony Diagnostic Services No. 1, LLC doing business as TridentCare[3] (Employer) from July 5, 2018, to May 4, 2020. (Certified Record (C.R.) at 9-10, 28, 173.) Claimant's last day of work was March 30, 2020. (*Id*. at 10.) Claimant applied for UC benefits on or around July 27, 2020. (*Id.* at 3, 168). In a Notice of Determination mailed on September 14, 2020, the UC Service Center found that "[C]laimant took a leave of absence for unknown reasons," and, due to a lack of information, Claimant was ineligible under Section 402(b) because he had not established a necessitous and compelling reason for leaving work. (*Id.* at 20.) Claimant appealed on September 29, 2020, and a telephonic hearing was held on November 3, 2020, at which Claimant appeared represented by counsel and a representative for Employer attended. (*Id.* at 28, 130.)

### A. *Proceedings before the Referee*

#### 1. Timeline of Events

The following is a timeline of events and communications between Employer and Claimant based on the record made before the Referee and is generally undisputed. Claimant began working full time for Employer, a mobile diagnostic company for healthcare, as a Radiologist Technician on July 5, 2018. (*Id.* at 165-66, 173-74.) Claimant, who resides in Butler County, traveled regularly around Western Pennsylvania for work and communicated with Employer by text and email

---

[3] Employer is also referred to as No. 1, Inc. and as Mobile-X. (Certified Record at 143.)

using an Employer-provided computer and telephone.  (*Id*. at 166-67.)  Claimant allegedly injured his knee during his overnight shift on March 29-30, 2020, while moving and lifting a heavy machine.  (*Id*. at 153-54.)  Claimant then informed his manager/immediate supervisor Teresa Kukic (Supervisor) that he would not be returning to work the next day he was scheduled due to the injury.  (*Id*. at 169.)  On March 31, 2020, Employer requested medical documentation from Claimant regarding his knee.  (*Id*. at 154.)  Claimant visited his primary care physician (Physician), whose office is in Allegheny County,[4] on April 2, 2020.  Physician

---

[4] The Referee took judicial notice of:  the COVID-19 Pandemic; Governor Wolf's "Stay at Home" order; and Allegheny County entering the "red phase" on March 23, 2020, "yellow phase" on May 15, 2020, and "green phase" on June 5, 2020.  (C.R. at 167-68.)  Further, the Referee took judicial notice that Butler County entered the "red phase" on March 27, 2020, "yellow phase" on May 15, 2020, and "green phase" on June 5, 2020.  (*Id.*)  Governor Wolf's "Stay at Home" order initially applied to seven counties, including Allegheny County, for the period from March 23, 2020, to April 6, 2020, but was extended statewide and through April 30, 2020, on April 1, 2020. The "Stay at Home" order stated:

> Individuals may leave their residence only to perform any of the following allowable individual activities and allowable essential travel:
>
> - Tasks essential to maintain health and safety, or the health and safety of their family or household members (including pets), such as obtaining medicine or medical supplies, visiting a health care professional, or obtaining supplies they need to work from home
> - Getting necessary services or supplies for themselves, for their family or household members, or as part of volunteer efforts, or to deliver those services or supplies to others to maintain the safety, sanitation, and essential operation of residences
> - Engaging in outdoor activity, such as walking, hiking or running if they maintain social distancing
> - To perform work providing essential products and services at a life-sustaining business
> - To care for a family member or pet in another household
> - Any travel related to the provision of or access to the above-mentioned individual activities or life-sustaining business activities
> - Travel to care for elderly, minors, dependents, persons with disabilities, or other vulnerable persons

advised Claimant to stay off his feet and knee from March 31, 2020, through April 7, 2020, referred him for an x-ray, and provided Claimant with an excuse, which Claimant gave to Employer. (*Id*. at 105, 168, 170-71; Referee's Decision, Finding of Fact (FOF) ¶ 7.) Claimant last visited Physician in person on April 7, 2020, was advised not to return to work from April 7, 2020, through April 14, 2020, and was given a medical excuse, which Claimant provided to Employer. (C.R. at 106, 171; FOF ¶ 8.)

---

- Travel to or from educational institutions for purposes of receiving materials for distance learning, for receiving meals, and any other related services
- Travel to return to a place of residence from an outside jurisdiction
- Travel required by law enforcement or court order
- Travel required for non-residents to return to their place of residence outside the [C]ommonwealth

The following operations are exempt:

- Life-sustaining business activities
- Health care or medical services providers
- Access to life-sustaining services for low-income residents, including food banks
- Access to child care services for employees of life-sustaining business that remain open . . . .
- News media
- Law enforcement
- The federal government
- Religious institutions

Governor Wolf and Health Secretary Issue 'Stay at Home' Orders to 7 Counties to Mitigate Spread of COVID-19, Governor Tom Wolf (March 23, 2020), available at https://www.governor.pa.gov/ newsroom/governor-wolf-and-health-secretary-issue-stay-at-home-orders-to-7-counties-to-mitigate-spread-of-covid-19/ (last visited March 18, 2022); Gov. Wolf, Sec. of Health: Pennsylvania on Statewide Stay-at-Home Order Beginning at 8 PM Tonight, "Most Prudent Option to Stop the Spread," Governor Tom Wolf (April 1, 2020), https://www.governor.pa.gov/newsroom/gov-wolf-sec-of-health-pennsylvania-on-statewide-stay-at-home-order-beginning-at-8-pm-tonight-most-prudent-option-to-stop-the-spread/ (last visited March 18, 2022). The April 1, 2020 "Stay at Home" order added to the first list that "[a]nyone performing life-sustaining travel does not need paperwork to prove the reason for travel," and "emergency medical services personnel, firefighters" to the second list.

4

Approximately three days after Claimant began medical leave, Employer shut off Claimant's laptop. (C.R. at 172.) On April 13, 2020, Employer's Human Resources Department Manager, Jane LaPorte (HR Manager) emailed Claimant at his personal email, stating

> I've been delayed in sending you the attached information on Leave of Absence, which I apologize for.
>
> Please read the letter and brochure that explains the [Family and Medical Leave Act[5] (FMLA)] and company process. Please complete the Request for Leave and return to [Employer's Email], at your earliest convenience.
>
> Please have your healthcare provider complete the attached Certification . . . and . . . return[] to: [Employer's Email], (or fax[] to: [Employer's Fax Number]) at your earliest convenience. . . .
>
> Please keep both your Supervisor and HR updated regarding when you will be able to return.

(C.R. at 87.) Attached to the email was a letter, dated April 13, 2020, outlining the FMLA paperwork process and that Physician would need to sign a job description once Physician was ready to release Claimant back to work. Neither the email nor the attached letter mentioned a specific timeframe for completing or submitting the FMLA paperwork or set forth the consequences for not having the paperwork completed within a particular time. (*Id.* at 89-94.)

Supervisor texted Claimant on April 14, 2020, to advise that an email had been sent to Claimant's personal email and that Employer would "need [the] forms completed and job description filled out by [D]r[.] when released." (*Id.* at 113.) Claimant texted that he had not seen the email, would look at it soon, and would get the paperwork done. (*Id.*)

_____

[5] 29 U.S.C. §§ 2601, 2611-2620, 2631-2636, 2651-2654.

On April 16, 2020, Supervisor inquired about what Claimant was doing as his note from Physician ended on April 14, 2020, and Claimant responded with a medical excuse dated April 14, 2020, excusing him from work from April 7, 2020, through April 21, 2020. (*Id.* at 110-11.) Supervisor inquired if Claimant had completed the paperwork, to which Claimant responded on April 17, 2020, asking for a paper copy of the FMLA paperwork to be mailed to him. (*Id.* at 110, 112.) Claimant explained that he had no printer at his home and the public library was indefinitely closed. (*Id.* at 112.) Supervisor stated Claimant had to use his personal laptop and "should be able" to fill out the paperwork on the computer and save it, but Supervisor would check to see if this was possible. (*Id.* at 112, 114.) Claimant said the .pdfs of the paperwork did not appear active on his phone and he would try his laptop, and Supervisor advised Claimant that there was "a time[]frame on that request to submit" and to reach out if help was needed. (*Id.*)

On April 19, 2020, Supervisor emailed Claimant advising him, among other things, that his leave request for September 2020 was not approved, pending clarification of his current situation, and that he needed to include her and Amy Garret, who is Employer's Director of Administration and Human Resources Department (HR Director), when he submitted the paperwork. (*Id.* at 84.) Supervisor also texted on April 20, 2020, inquiring about the FMLA paperwork, to which Claimant replied, indicating that he did not have WiFi and the public library was closed and asking for patience. (*Id.* at 115.) Supervisor responded that she understood, but there was a timeframe that was set by the corporate office, not her. (*Id.*) Supervisor also asked if Claimant was returning to work that week, and Claimant replied that he was not and was "trying to apply for the FMLA leave per the [e]mail [he] received from HR." (*Id.*) Supervisor responded "O[K] – [HR

6

Director] w[ould] send [him] more." (*Id.*) Claimant also informed Supervisor via text that he hoped to "make a comeback" after he improved. (*Id.* at 116.)

Claimant responded to Supervisor's April 19, 2020 email on April 20, 2020, stating he was trying to get the paperwork to work on his personal laptop. (*Id.* at 84.) Supervisor responded that HR Director would "add some info as needed." (*Id.* at 83.) HR Director emailed Claimant on April 20, 2020, advising that "[p]er federal guidelines, [his] FMLA claim w[ould] be denied if [Employer] d[id] not receive the forms within 15 calendar days" and suggesting that if Claimant had a way to get the forms to Physician "sooner that would be best." (*Id.*) Claimant responded that "[i]t sound[ed] like [he] need[ed] paper forms" and inquired about the 15-day timeframe and when that began. (*Id.* at 82-83.) HR Director responded that the 15 days began to run on April 13, 2020, as that was the day the forms were sent to Claimant, and offered to fax the forms to Physician's office as Claimant was having trouble printing them. (*Id.* at 82.)

Also on April 20, 2020, HR Director emailed another copy of the paperwork to Claimant's personal email. (*Id.* at 80.) Claimant responded that he could not see the encrypted email and did not know how to unencrypt the email. Because Claimant could not print the paperwork, Claimant inquired if he was supposed to forward it electronically to Physician unless Employer could mail him the paper forms to submit. (*Id.* at 79-80.) HR Director re-sent the materials in an unencrypted format and advised Claimant that he had eight more days to submit the paperwork and, therefore, emailing it to Physician was better than mailing the paper forms. (*Id.* at 79.)

Claimant advised HR Director, on April 21, 2020, that Physician wanted the FMLA paperwork faxed and provided the fax number and address. (*Id.* at 82.) HR

Director responded that she was having difficulty in faxing the FMLA paperwork to Physician. (*Id*.) That same day, Supervisor asked Claimant, via text, to turn in his vehicle, uniform, keys, badge, and other items. (*Id*. at 118.)

On April 22, 2020, a Wednesday, HR Director emailed Claimant advising that she was still having difficulty faxing the FMLA paperwork to Physician, which would not go through, and that she put a paper copy of the paperwork in the mail the prior night. (*Id.* at 79.) Claimant replied on April 23, 2020, at 4:59 a.m.,[6] explaining that Physician's office was closed on Wednesdays and to try on another day. (*Id*.) HR Director responded, explaining that she had tried twice on Tuesday (April 21) and once that day (April 23) and the faxes were still not going through. (*Id.* at 78.) Claimant replied, indicating he contacted Physician's office to check the fax number and confirmed with HR Director that this was the one being used, which it was. (*Id.*) On April 24, 2020, at 2:59 p.m., Claimant emailed HR Director, explaining that he called Physician's office to reconfirm the fax number and was told that it still had not received the fax and that the office was receiving faxes. (*Id.*) This was the last direct communication between Claimant and Employer.

HR Director placed the FMLA paperwork in the mail late in the day on April 21, 2020, and it was likely mailed to Claimant's home the following day, April 22, 2020. (*Id*. at 177.) Claimant likely received the paperwork on April 27 or 28, 2020, and mailed it to Physician as soon as he received it. (*Id*. at 158.) Employer mailed Claimant a letter dated May 5, 2020. That letter indicated that it was to "confirm that [Claimant's] employment with [Employer] is terminated effective May 4, 2020 . . . ." (*Id*. at 119.) The letter did not provide a reason for the termination. (*Id.* at

---

[6] The Referee found that this email was sent at 4:59 **p**.m.; however, the record indicates that it actually was sent in the morning at 4:59 **a**.m. (FOF ¶ 20; C.R. at 79.)

8

119-20.) The FMLA paperwork was allegedly completed and allegedly faxed by Physician on May 11, 2020. (*Id*. at 100-03.)

### 2. Claimant's Testimony

Claimant testified to the following. Claimant had difficulty opening, completing, and printing the electronic versions of the FMLA paperwork, as reflected in the texts and emails, because he needed a paper copy to provide to Physician, who would not accept an electronic copy, and Claimant had asked for a paper copy to be sent. (*Id*. at 154-57, 160.) Claimant explained that it took about 14 or 15 days of the 15-day timeframe to get the paperwork himself, and then, due to Governor Wolf's "Stay at Home" order, he had to mail the document to Physician in Allegheny County, rather than take it in person. (*Id*. at 158-59.) Additionally, Physician's submission of the paperwork may have been delayed because, due to the COVID-19 Pandemic, Physician had reduced his office hours and days and was working at a hospital. (*Id*. at 159.) Claimant contacted Physician's office and spoke with a nurse several times regarding the initial attempts to fax the paperwork and subsequently spoke with the nurse about mailing a paper copy, when it would be expected at the office, "and that it needed to be filled out in a timely manner." (*Id*. at 159-60.) Claimant called Physician's office two or three times after sending the paperwork, reminding it that there was a deadline for its submission. (*Id*. at 160.)

Concerning his job duties, Claimant was a Mobile Technologist, traveling to nursing homes and taking x-ray images of patients, which requires heavy lifting that Claimant could not perform due to his injury. (*Id*. at 161-62.) Claimant did not initially obtain the x-ray as advised by Physician because the "x-ray [facility] was closed due to the [COVID-19 P]andemic[,] so [he] had no information to show [it] and [he] was paying out-of-pocket also." (*Id.* at 171.) Claimant did not follow up

9

later because by the end of April, Claimant felt he "got better" after resting his leg. (*Id*.) Claimant believed he was able and available to perform light or sedentary work during the time he was injured, and he explained Employer did not offer any of that type of work and that he had recovered "[a]round the end of April" but continued to have residual pain. (*Id*. at 162.) Claimant communicated to Supervisor in a text that he wanted to come back and received a "positive response" in return. (*Id*. at 163-64.) When asked if he had ever given a specific return to work date to Employer, Claimant explained that Physician's notes removed him from work through April 21, 2020, that Physician was trying to get the FMLA paperwork processed, and that otherwise he was "just waiting to he[a]r from [Employer]" and "for [Employer] to inform [him] of the schedule" because he could not access it from his work computer or personal phone. (*Id*. at 164.) Claimant never told Employer that he did not intend to return once he had recovered. (*Id*. at 164-65.)

### 3. Employer's Evidence

HR Director testified on behalf of Employer as follows. When Employer received an FMLA request, the HR Department would send the employee information on how to request a leave of absence and contact Employer's third-party administrator (TPA). (*Id.* at 174.) Employer did not receive any FMLA paperwork directly but would receive notice if a claim was approved. (*Id*. at 174-75.) HR Director was not aware if a completed FMLA request for Claimant ever reached Employer or the TPA. (*Id*. at 175.) Employer did not offer or give accommodations to an employee who could not perform the job description requirements; thus, for any personal medical leave of absence, there were no accommodations. (*Id*.) Employer requires any returning employee who took a medical leave of absence to have a physician sign the employee's job description to confirm that the employee

is capable of performing the job duties. (*Id*. at 175-76.) HR Director did not advise Claimant or Physician of this requirement and was unsure whether anyone else did so. (*Id*. at 176.)

HR Director was asked if it was Employer's position that Claimant was discharged, and she testified that Employer's position was that Claimant "voluntarily resigned because he exhausted the personal leave that was granted because the FMLA paperwork was not turned in before the deadline" "without any indication of . . . a return or a note to return or any communication as of a date of return"; thus, Claimant's separation was processed on May 4, 2020. (*Id*. at 176-77.) Work continued to be available to Claimant had he advised Employer of his intent to return to work. (*Id.* at 179.) On cross-examination, HR Director agreed that Claimant expressed his inability to open and access the encrypted email, Claimant asked if he was expected to forward the FMLA request to Physician electronically, Claimant informed Employer about Physician's reduced hours and closure on Wednesdays, and Claimant confirmed the fax number and capabilities of Physician. (*Id*. at 180-81.) HR Director further admitted it was clear that conditions outside of Claimant's control caused difficulty in getting the paperwork to Physician, causing HR Director to eventually deposit a physical copy in the mail. (*Id*. at 181.) Employer did not receive any documentation from Claimant expressing a desire to resign. (*Id*.) HR Director noted that Claimant did not attempt to communicate with Employer about returning or reapplying after the May 5, 2020 letter. (*Id.* at 182.)

### B. Referee's Decision

Following the hearing, the Referee issued a decision finding Claimant ineligible for benefits pursuant to Section 402(b) on the basis that Claimant failed to show that he voluntarily left his employment under necessitous and compelling

circumstances. (Referee's Decision at 4-5.) In doing so, the Referee made the following relevant findings of fact:

3. During the [C]laimant's employment, the [E]mployer required employees in the [C]laimant's position to certify that they were able to perform the physical job duties prior [to] returning to work following a personal leave of absence.

4. During the [C]laimant's shift that began the evening of March 29, 2020[,] in the early hours of March 30, 2020[,] the [C]laimant began experiencing pain in his knee[,] but he completed his shift without reporting anything to the [E]mployer.

5. The [C]laimant properly notified the [E]mployer that he needed to be absent from work due to knee pain for his next scheduled shift.

6. When the [C]laimant notified the [E]mployer of his need to be absent for knee pain for the second consecutive day, the [E]mployer requested that the [C]laimant provide medical documentation pursuant to its procedures supporting the [C]laimant's absence from work.

7. On April 2, 2020, the [C]laimant was seen by . . . [P]hysician who advised him to be off work from March 31, 2020[,] through April 7, 2020[,] due to his knee pain and provided him with a medical excuse, which the [C]laimant later provided to the [E]mployer.

8. On April 7, 2020, the [C]laimant was seen again by . . . [P]hysician, who advised him to be off work from April 7, 2020[,] through April 14, 2020[,] and provided him with a medical excuse, which the [C]laimant later provided to the [E]mployer.

9. On April 13, 2020, . . . [HR M]anager e[]mailed the [C]laimant outlining the [E]mployer's process for requesting . . . FMLA[] leave; providing the [C]laimant with the required FMLA [paperwork] to be completed by his medical provider; letting the [C]laimant know that the [E]mployer's F[]MLA leave [coordinator] which was normally administered by a [TPA], was not presently handling FMLA leave requests through May 1[, 2020]; requesting that the [C]laimant return the completed FMLA paperwork directly to the [E]mployer at his earliest convenience; and advising that the [C]laimant's medical

12

provider must complete and return a signed enclosed job description once the [C]laimant was released to return to work.

10. On April 14, 2020, the [C]laimant received a medical excuse from . . . [P]hysician without being seen by . . . [P]hysician that excused him from work from April 7, 2020[,] through April 21, 2020.

11. On April 16, 2020, the [C]laimant sent the [E]mployer a copy of the April 14th medical excuse via text message to his [S]upervisor and the [S]upervisor replied by e[]mail asking if the [C]laimant would return to work on April 21, 2020.

12. Then on April 16, 2020, . . . [S]upervisor sent him text messages advising that the [E]mployer needed to know his status because no leave of absence paperwork had been returned and his leave ended April 14, 2020[,] and any time off work after April 14, 2020[,] would be unpaid due to his exhaustion of paid sick leave.

13. On April 17, 2020, the [C]laimant sent text messages to his [S]upervisor asking for the leave of absence paperwork to be mailed to him[,] and his [S]upervisor replied that he could complete the paperwork and return it electronically and reminded the [C]laimant of the time[]frame to submit the leave request.

14. On April 19, 2020, . . . [S]upervisor e[]mailed him advising that his company[-]issued vehicle and other items would need to be returned that week and that his vacation leave would continue to be added until it is depleted or until he returned to work.

15. On April 20, 2020, . . . [S]upervisor sent text messages to the [C]laimant inquiring about his status and whether he was returning to work that week[,] and the [C]laimant replied that he was applying for FMLA leave but had difficult[y] with the paperwork.

16. On April 20, 2020, . . . [HR Director] e[]mailed the [C]laimant advising that per federal guidelines his FMLA leave request would be denied if not received within [15] calendar days and that his doctor must sign the FMLA leave form and through additional e[]mails between them that day, the [E]mployer clarified the deadline to return the completed FMLA leave form was [15] calendar days from April 13, 2020, the date the form was sent to the [C]laimant and the [E]mployer offered to fax the form to . . . [Physician's] office since the [C]laimant was having difficulties with the paperwork.

17. On April 21, 2020, . . . [S]upervisor sent text messages to [Claimant] requesting that he turn in his company vehicle, equipment, phone, badge[,] and other items.

18. Also, on April 21, 2020, . . . [HR Director] e[]mailed the [C]laimant advising she was having difficulties faxing the FMLA [paperwork] to . . . [Physician's] office.

19. On April 22, 2020, . . . [HR Director] e[]mailed the [C]laimant advising she was having difficulties faxing the FMLA [paperwork] to . . . [Physician's] office.

20. On April 23, 2020[,] at 4:59 [a].m., the [C]laimant replied to . . . [HR Director]'s e[]mail stating to try faxing again and provided information of [Physician's] office['s] business hours.

21. On April 24, 2020, the [C]laimant e[]mailed . . . [HR Director] advising that . . . [Physician's] office had not received the faxed FMLA leave request forms from the [E]mployer.

22. The [C]laimant did not contact the [E]mployer from April 24, 2020[,] through May 5, 2020.

23. When the [C]laimant had not been released by [Physician] to return to full[-]duty or light[-]duty work and he had not submitted the FMLA leave request forms or any documentation advising the [E]mployer that he was able to return to work in his position or actually returning to work, then the [E]mployer sent the [C]laimant a letter via mail that was dated May 5, 2020[,] advising that he was separated from work effective May 4, 2020.

24. On May 11, 2020, . . . [P]hysician completed the FMLA leave request form advising that the [C]laimant was referred to orthopedic and FMLA forms needed to be completed by [an orthopedist].

25. Continued work was still available to the [C]laimant from the [E]mployer at the time he left.

26. The [C]laimant's completed FMLA leave request was never submitted to the [E]mployer.

27. The [C]laimant did not contact the [E]mployer after May 11, 2020. . . . .

14

29. In September 2020, the [C]laimant received a copy of the May 11[, 2020,] completed FMLA leave request form from [Physician] whose office informed him that [it] had previously faxed the form to the [E]mployer.

. . . .

(FOF ¶¶ 3-27, 29.)

The Referee held that, based on the competent record evidence, Claimant's separation was voluntary because he voluntarily remained off work without communicating to Employer "a return-to-work date or submitting the requested completed FMLA leave request form," and because his last communication with Employer was April 24, 2020. (Referee's Decision at 4.) Further, the Referee explained that, while "[C]laimant had a serious health issue that prevented him from performing his work at the time he began his leave of absence and through the date of the appeal hearing," he

> failed to exhaust all reasonably available alternatives to resigning from his employment such as attempting to follow up with the orthopedic medical provider upon the advice of . . . [P]hysician or following up with . . . [P]hysician to see if he could be released to light[-]duty or full[-]duty work.

(*Id.* at 4-5.) In addition, the Referee concluded that "[C]laimant remained out of work without trying to get the necessary paperwork from his medical providers that would permit him to return to work or even to request an accommodation or restriction and he ceased communicating with the [E]mployer after April 24, 2020." (*Id.* at 5.) As a result, the Referee held that Claimant did not meet his burden of showing that he voluntarily left work for necessitous and compelling reasons and was, therefore, ineligible for UC benefits. Claimant appealed to the Board.

*C. The Board's Order*

Upon its review, the Board concluded that the Referee's Decision was proper under the Law and adopted and incorporated the Referee's findings of fact and conclusions of law. The Board explained that "[a] lengthy absence may evidence a conscious intent to quit especially [where], as here, there was no certainty when the [C]laimant would return to work[,] and he ceased communicating with the [E]mployer." (Board Order.) According to the Board,

> [e]ven though the [C]laimant ultimately received the paperwork to provide to [Physician], he did not act reasonably to assure it was promptly completed and returned to his agent. For example, if the [C]laimant was willing to visit a library to access his email, there is no reason he could not personally deliver the paperwork to his doctor, but he instead chose to delay further with mail. Then the [C]laimant apparently did not press the urgency of the matter to [Physician], causing its completion to be delayed until May 11, 2020. This unexplained delay negates whatever justification the [C]laimant initially had for his failure to promptly comply with the [E]mployer's request.

(*Id.*) Claimant submitted a request for reconsideration, on which the Board did not rule. (Supplemental Record, Exhibit 1.) Claimant filed a petition for review of the Board's Order on April 20, 2021.[7]

## II. PARTIES' ARGUMENTS

On appeal, Claimant asserts three reasons why the Board's Order must be reversed or required reconsideration by the Board.[8] First, findings of fact 13, 16,

---

[7] This Court's review in a UC "case is limited to a determination of whether constitutional rights were violated, errors of law were committed, or" essential findings of fact were not supported by substantial evidence. *Lee Hosp. v. Unemployment Comp. Bd. of Rev.*, 637 A.2d 695, 697 (Pa. Cmwlth. 1994).

[8] The order of the parties' arguments has been rearranged for ease of discussion.

16

and 26 are not supported by substantial evidence and the Board erred by concluding that Claimant was ineligible for benefits under Section 402(b) because Claimant did not manifest any intent to leave his employment and reasonably attempted to comply with the requirements for submitting his FMLA claim in a timely manner. Second, this case should have been decided under Section 402(e) of the Law,[9] not Section 402(b), because Employer created the circumstances that led to Claimant's separation. Third, the Board abused its discretion in refusing to grant reconsideration.

The Board responds that its findings are conclusive because substantial evidence supports them and it did not err in finding Claimant ineligible under Section 402(b) because Claimant demonstrated a conscious intent to quit, based both on his lack of communication and his lengthy absence from work, indicating that he abandoned his job. Second, Claimant is ineligible for benefits because he voluntarily quit work and, therefore, Section 402(e) is inapplicable. Third, the Board's decision to grant or deny Claimant's request for reconsideration is not appealable because Claimant filed his petition for review before the Board ruled on Claimant's request.

## III. DISCUSSION

### A. Substantial Evidence

We begin with Claimant's challenge to findings of fact 13, 16, and 26. "The Board's findings are conclusive on appeal so long as the record, when viewed in its entirety, contains substantial evidence to support the findings." *W. & S. Life Ins. Co. v. Unemployment Comp. Bd. of Rev.*, 913 A.2d 331, 334 n.2 (Pa. Cmwlth. 2006).

---

[9] Section 402(e) provides that "[a]n employe shall be ineligible for compensation for any week" "[i]n which [their] unemployment is due to [their] discharge . . . from work for willful misconduct connected with [their] work . . . ." 43 P.S. § 802(e).

Substantial evidence is defined as "relevant evidence upon which a reasonable mind could base a conclusion." *Johnson v. Unemployment Comp. Bd. of Rev.*, 502 A.2d 738, 740 (Pa. Cmwlth. 1986). The Board is the ultimate factfinder and is empowered to make its own determinations as to evidentiary weight and the resolution of conflicting evidence. *Constantini v. Unemployment Comp. Bd. of Rev.*, 173 A.3d 838, 843 (Pa. Cmwlth. 2017). "[T]his Court is bound 'to examine the [evidence] in the light most favorable to the party in whose favor the Board has found, giving that party the benefit of all inferences that can logically and reasonably be drawn'" therefrom. *U.S. Banknote Co. v. Unemployment Comp. Bd. of Rev.*, 575 A.2d 673, 674 (Pa. Cmwlth. 1990) (quoting *Taylor v. Unemployment Comp. Bd. of Rev.*, 378 A.2d 829, 831 (Pa. 1977)). That there may be record evidence "that could support a contrary conclusion" does not mean "that the findings of fact are not supported by substantial evidence." *Constantini*, 173 A.3d at 842-43 (citing *Johnson v. Unemployment Comp. Bd. of Rev.*, 504 A.2d 989, 990 (Pa. Cmwlth. 1986)). However, even if "[t]he Board's findings of fact are conclusive upon appeal[,] . . . the legal conclusions drawn by the Board from its findings of fact remain subject to judicial review." *McCarthy v. Unemployment Comp. Bd. of Rev.*, 829 A.2d 1266, 1270 (Pa. Cmwlth. 2003) (citing *Taylor*, 378 A.2d at 832).

Claimant first challenges finding of fact 13, which states:

> On April 17, 2020, the [C]laimant sent text messages to his [S]upervisor asking for the leave of absence paperwork to be mailed to him[,] and his [S]upervisor replied that he could complete the paperwork and return it electronically and **reminded** the [C]laimant of **the time[]frame** to submit the leave request.

(FOF ¶ 13 (emphasis added).) Claimant contends that this is not supported by the record because Supervisor did not "**remind**[]" Claimant of any **specific** timeframe,

18

as implicated by the finding's use of "**the** time[]frame." (*Id.* (emphasis added).) The Board argues that this finding "does not provide a 'specific timeframe,'" as Claimant argues, "but only [that Supervisor] reminded Claimant 'of the time[]frame to submit the leave request,'" which Supervisor's text message supports. (Board's Brief (Br.) at 10 (quoting FOF ¶ 13).)

In the text message at issue, Supervisor stated that Claimant had "**a time[]frame** on that request to submit." (C.R. at 114 (emphasis added).) A review of the record reveals that prior to this text, the only timeframe referenced, as set forth in finding of fact 9, was in HR Manager's email, and that timeframe was "at [Claimant's] earliest convenience." (FOF ¶ 9; C.R. at 87.) As such, to the extent that finding of fact 13 categorizes Supervisor's statement as a **reminder** of "**the**" timeframe to submit the FMLA paperwork, we agree with Claimant that it implies that the specific timeframe had been communicated to Claimant when there is no evidence that was the case. The first reference to a specific timeframe other than "at your earliest convenience," (C.R. at 87), was the 15-day time period set forth in an email from HR Director on April 20, 2020, (*id.* at 83). For these reasons, even when viewed in the light most favorable to Employer, we conclude that a reasonable mind would not accept the April 17, 2020 text to support the finding that the text was a **reminder** to Claimant of **the** timeframe in which he had to submit the FMLA paperwork. Therefore, that finding is not supported by substantial evidence.

Claimant next challenges finding of fact 16, which states:

On April 20, 2020, . . . [HR Director] e[]mailed the [C]laimant advising that per federal guidelines his FMLA leave request would be denied if not received within [15] calendar days and that his doctor must sign the FMLA leave form and through additional e[]mails between them that day, the [E]mployer clarified the deadline to return the completed FMLA leave form was [15] calendar days from April 13, 2020, the date the form was sent to the [C]laimant and the [E]mployer offered to fax

19

the form to . . . [Physician's] office since the [C]laimant was having difficulties with the paperwork.

(FOF ¶ 16.) Claimant contends that this finding of fact "over-generalizes the actual events" and "d[oes] not . . . fully describe the email chain." (Claimant's Br. at 31-32.) The Board responds that this finding contains "three salient points: (1) the application was due April 28, 2020; (2) Claimant was having difficulties accessing the application; and (3) [HR D]irector would fax the application directly to [Physician] to expedite the process." (Board's Br. at 11.) The Board posits that it is not required to specifically address every piece of evidence contained in this email chain.

In rendering a decision, the factfinder "is required to make crucial findings of fact on all essential issues necessary for review" on appeal "but is not required to address specifically each bit of evidence offered." *Pistella v. Workmen's Comp. Appeal Bd. (Samson Buick Body Shop)*, 633 A.2d 230, 234 (Pa. Cmwlth. 1993). While finding of fact 16 does not specifically set forth each email, it accurately summarizes the communications between Claimant and HR Director at that time and identifies the points the factfinder found particularly salient. That other facts could also be discerned from those emails does not render the finding made not supported by substantial evidence. *Constantini*, 173 A.3d at 842-43. To the extent that Claimant maintains that the finding of fact does not specifically say that April 20, 2020, was the first time Claimant was advised of the 15-day time period, no other finding of fact, and nothing else in the record, indicates that this information was provided to Claimant any earlier. For these reasons, we conclude that a reasonable mind would accept the April 20, 2020 emails between Supervisor and Claimant as supporting finding of fact 16. Therefore, that finding is supported by substantial evidence.

Last, Claimant challenges finding of fact 26, which states that "[t]he [C]laimant's completed FMLA leave request was never submitted to the [E]mployer." (FOF ¶ 26.) Claimant maintains that Employer did not dispute Claimant's testimony regarding Physician faxing the information on May 11, 2020, to the number provided by Employer three times, (C.R. at 148), and that, per HR Director's testimony, Employer does not directly receive any FMLA paperwork, as it is submitted to the TPA and Employer only receives information if a FMLA claim is approved, (*id.* at 174-75). The Board replies that, "[a]lthough the record is sufficient to find that Claimant's doctor **informed him** that the application was faxed to Employer (F[O]F [¶] 29), **it is not sufficient to find that the fax did, in fact, occur**," and that to accept it as such would be allowing impermissible hearsay. (Board's Br. at 12 (emphasis in original).) The Board further asserts that, ultimately, finding of fact 26 is not necessary to its determination because "Claimant had already demonstrated a conscious intent to quit." (*Id.* at 13.) Claimant responds in his Reply Brief that the Board's hearsay assertion is untimely, and whether or not the fax was actually sent is moot because Claimant was terminated via the May 5, 2020 letter before Physician was able to send the completed forms.

The record on this point is not entirely clear. The April 13, 2020 email from HR Manager indicates that the paperwork had to be returned to Employer, and not the TPA, because the TPA was "not processing these . . . until after **May 1**[, 2020,]" but the FMLA request was allegedly submitted on **May 11**, 2020, after the relevant date. (C.R. at 87-88 (emphasis added).) HR Director was not asked if the FMLA paperwork was ever submitted to Employer; rather, she testified that it would be submitted to the TPA, she "did not get any information regarding whether or not it was received by the [TPA]," and she would have received information had the claim

21

been approved. (*Id.* at 174-75.) Thus, while it appears that Claimant's FMLA paperwork was not submitted to Employer, it is not clear, based even on Employer's own evidence, that it had to be. Ultimately, however, this finding is not necessary to support the Board's determination that Claimant voluntarily left work without cause of a necessitous and compelling nature; that it might not be supported by substantial evidence does not preclude affirmance. *Sargent v. Unemployment Comp. Bd. of Rev.*, 630 A.2d 534, 536 (Pa. Cmwlth. 1993).

Having resolved Claimant's challenges to the findings of fact, we now consider whether the Board erred in finding Claimant ineligible for UC benefits under Section 402(b).

*B. Section 402(b)*

Section 402(b) of the Law states that a claimant "shall be ineligible for compensation for any week" "[i]n which his unemployment is due to voluntarily leaving work without cause of a necessitous and compelling nature." 43 P.S. § 802(b). To be eligible for UC benefits, the burden is on the claimant to establish either that the separation from employment was involuntary or was voluntary but the result of a cause of a necessitous and compelling nature. *Greenray Indus. v. Unemployment Comp. Bd. of Rev.*, 135 A.3d 1140, 1143 (Pa. Cmwlth. 2016) (citing *Watkins v. Unemployment Comp. Bd. of Rev.*, 65 A.3d 999, 1004 (Pa. Cmwlth. 2013)). "Whether a [c]laimant's separation from employment is the result of voluntary action or a discharge is a **question of law** subject to this Court's review . . . ." *Middletown Township v. Unemployment Comp. Bd. of Rev.*, 40 A.3d 217, 224 (Pa. Cmwlth. 2012) (emphasis added). "When making a determination of whether a person voluntarily left [their] employment, we must examine the totality of the facts surrounding the cessation of employment." *Thiessen v. Unemployment Comp.*

22

*Bd. of Rev.*, 178 A.3d 255, 260 (Pa. Cmwlth. 2018). A "[claimant's] failure to take all necessary and reasonable steps to preserve [their] employment will result in a voluntary termination of employment." *Id.*

"A voluntary termination requires a finding 'that the claimant had a conscious intent to leave employment.'" *Wise v. Unemployment Comp. Bd. of Rev.*, 111 A.3d 1256, 1263 (Pa. Cmwlth. 2015) (quoting *Procyson v. Unemployment Comp. Bd. of Rev.*, 4 A.3d 1124, 1127 (Pa. Cmwlth. 2010)). However, "[a] voluntary termination is not limited to a formal or even an express resignation; it can be inferred from the [claimant's] conduct." *Id.* An "absence from work may become a voluntary termination through a lapse of an unreasonable amount of time." *Dike v. Unemployment Comp. Bd. of Rev.*, 68 A.3d 398, 401 (Pa. Cmwlth. 2013). "The test of a reasonable length of time, however, must be measured by all the circumstances known by both the employer and [claimant]." *McCarty v. Unemployment Comp. Bd. of Rev.*, 380 A.2d 1331, 1333 (Pa. Cmwlth. 1978). When a prolonged absence is at issue, the burden "is on the [claimant] to manifest to [the] employer [their] intention not to abandon [their] employment." *Simpson v. Unemployment Comp. Bd. of Rev.*, 370 A.2d 432, 434 (Pa. Cmwlth. 1977).

Claimant argues he did not quit or manifest any intention to quit his job, and that factors outside his control, coupled with Employer's refusal to timely inform Claimant of the deadlines and the consequences if those deadlines were not met or to mail Claimant the paperwork when asked, prevented him from submitting the FMLA paperwork within 15 days. Claimant asserts that he acted diligently and reasonably under the circumstances and expressed his intent to remain employed by discussing returning to work when he medically improved and asking for time off in September.

23

The Board responds that Claimant's lengthy absence from work and lack of communication supports its conclusion that Claimant abandoned his job. According to the Board, although Employer was not "blameless," "Employer clearly was attempting to expedite the matter as much as possible so Claimant could meet the not yet explicit deadline of April 28, 2020." (Board's Br. at 16-18.) In contrast, the Board argues, Claimant "did not act with any sense of urgency" and his reliance on the "Stay at Home" order for not personally delivering the paperwork to Physician is misplaced as "Employer was an essential business." (*Id.* at 19 & n.4.) The Board maintains that Claimant did not take the "necessary and reasonable steps to preserve his employment" and that his conduct was inconsistent with a desire to remain employed. (*Id.* at 20 (quoting *Thiessen*, 178 A.3d at 260).)

There is no dispute that Claimant did not expressly advise Employer of his intent to quit or resign from his employment, but such express resignation is not required if it can be inferred from Claimant's conduct that he intended to quit. *Wise*, 111 A.3d at 1263. Here, the Board's bases for inferring Claimant's conscious intent to quit his employment were: (1) "Claimant remain[ing] out of work without trying to get the necessary paperwork" that would have permitted him to return to work; (2) Claimant failing to exhaust all reasonably available alternatives, such as obtaining a release for light-duty work and requesting an accommodation from Employer; and (3) Claimant failing to communicate with Employer after April 24, 2020. (Referee's Decision at 4-5; Board's Order.) The Board further emphasized that Claimant, having been willing to go to the library, should have personally delivered the FMLA paperwork to Physician, that Claimant "**did not press the urgency**" with Physician, and that this "**unexplained delay** negate[d] whatever justification the [C]laimant initially had." (Board Order (emphasis added).)

24

Reviewing these reasons and the totality of the credited facts surrounding the cessation of Claimant's employment, we conclude the Board erred in inferring that Claimant had a conscious intent to quit such that he voluntarily terminated his employment.

The undisputed record of communications between Employer and Claimant does not support the conclusion that Claimant was not trying to get the FMLA paperwork completed, particularly given the COVID-19 Pandemic red phase restrictions, of which the Referee took judicial notice. (C.R. at 167.) Between April 13, 2020, and April 24, 2020, dozens of texts and emails were exchanged between Claimant, Supervisor, and/or HR Director regarding the FMLA paperwork, Claimant's efforts to obtain and complete that paperwork, and attempts to get that paperwork to Physician. The volume of communication, Claimant's requests that the paperwork be mailed, and his efforts to have the paperwork faxed to Physician belie that he was not "trying to get the necessary paperwork" that would allow him to return to work. (Referee's Decision at 5.) Thus, this does not support the inference that Claimant had a conscious intent to quit his employment.

That Claimant did not ask Employer for an accommodation or seek to be released to light duty similarly does not support that conclusion. The record is clear, as testified to by Claimant and HR Director, that Employer did **not** offer or give accommodations or light-duty work for employees who were on a personal medical leave of absence. (C.R. at 170, 175.) Further, as HR Director testified, Employer required its employees to perform the duties in their job description, which Claimant could not have done during this time period. (*Id.* at 175.) As an employee is not required to engage in futile efforts to maintain their employment, *Mauro v. Unemployment Compensation Board of Review*, 751 A.2d 276, 279-80 (Pa. Cmwlth.

25

2000), Claimant's failure to ask for an accommodation cannot be used to infer an intent to quit his employment.

Concerning the lack of communication after April 24, 2020, Claimant testified that he believed there was nothing more for him to do once he mailed the FMLA paperwork to Physician, except "wait to he[a]r from [Employer]" and "for [Employer] to inform [him] of the schedule" and that he did not have his company computer to check the schedule. (*Id.* at 164-65.) Indeed, per HR Director, Employer required its employees to be able to perform their full duties and that Claimant could not return to work until Physician released him to do so. As Claimant had placed this process in motion, it is not clear what additional communication would have accomplished. Further, once Claimant received a letter "confirm[ing]" the termination of his employment on May 5, 2020, which had no reference to the reason for the termination or his reapplying or returning to work, (*id.* at 119-20), it is unclear how his not contacting Employer evinces a conscious intent **by him** to quit employment from which he had been terminated.

As to Claimant's ongoing absence, the reasonableness of an absence "is measured by all the circumstances known by both the employer and [the claimant]." *McCarty*, 380 A.2d at 1333. The circumstances known to both Claimant and Employer were that Claimant was injured on March 29-30, 2020, had been removed from work by Physician through April 21, 2020, was applying for FMLA leave, and was having difficulty doing so in the midst of the COVID-19 Pandemic. Further, during this timeframe, Claimant advised Employer that he hoped to return once he improved and sought leave in September 2020, suggesting that Claimant was not intending to abandon his employment. Under these circumstances, Claimant's ongoing absence while trying to complete the FMLA paperwork was not

unreasonable. Accordingly, this is not a reason that supports the inference that Claimant had a conscious intent to quit his employment.

With regard to the alleged lack of urgency and "unexplained delay" on Claimant's part, (Board Order), neither is supported when the facts, which reflect Claimant's efforts and explain the delays in submitting the FMLA paperwork, are viewed in their totality. On April 13, 2020, HR Manager candidly admitted that she had delayed sending the required FMLA paperwork, and without explaining the consequences of failing to complete the paperwork in a particular time period, instructed Claimant **twice** to have the paperwork completed "**at [his] earliest convenience**." (C.R. at 87 (emphasis added).) While a reference to "a time[]frame" was made in an April 17, 2020 text exchange with Supervisor, in which Claimant requested that the paperwork be mailed, it was only on **April 20, 2020**, that Claimant was **first** advised of the 15-day timeframe along with the consequences for not submitting the paperwork within that timeframe. (*Id.* at 112-14.) Henceforth, Claimant maintained ongoing communication with Supervisor and HR Director, as well as with Physician's office, in an effort to have the paperwork faxed. It was only after HR Director had problems faxing the paperwork that a copy of the paperwork was mailed to Claimant, five days after Claimant's initial request and a mere six days before the expiration of the deadline. Although the delay in Employer mailing the paperwork made it unlikely that Claimant would be able to return the completed FMLA paperwork within the 15-day timeframe, Claimant nonetheless mailed it to Physician upon receiving it and called Physician's office multiple times to reiterate that it needed to be completed promptly.

The Board faults Claimant for not physically delivering the paperwork because Employer was an essential business and Claimant chose to remain home

27

during the "Stay at Home" order. As to the first contention, it is unclear how Employer's ability to continue to operate would have authorized Claimant to personally deliver his personal FMLA paperwork to Physician. As to the second contention, the Board's reasoning is premised on its belief that if "[C]laimant was willing to visit a library to access his email," presumably violating the "Stay at Home" order, he should have delivered the FMLA paperwork in person to Physician. (Board Order). However, all Claimant testified to was that he called the public library and that it was closed due to the COVID-19 Pandemic, thereby making it impossible for any such visit to occur. (C.R. at 155.) The Board's nonchalance about requiring Claimant to cross county lines to personally deliver the paperwork, which he believed would violate the "Stay at Home" order, placed an unreasonable burden on Claimant during those uncertain times.

Claimant has established, based on the totality of the credited facts surrounding the cessation of his employment, that he made the necessary and reasonable efforts to preserve his employment by remaining in contact with Employer and attempting to obtain the paperwork in multiple formats and ways and have it completed in the midst of difficult circumstances, which is all that is required. *Thiessen*, 178 A.3d at 260. As even HR Director recognized, conditions **outside of Claimant's control** caused many of the difficulties in getting the FMLA paperwork to Physician to be completed. (C.R. at 181.) Therefore, we do not view these reasons as supporting the inference that Claimant had a conscious intent to quit his employment.

## IV. CONCLUSION

Based on the totality of the credited facts, we conclude, as a matter of law, that Claimant's actions did not reflect a conscious intent to quit his employment and that Claimant took all necessary and reasonable steps to preserve his employment. *Thiessen*, 178 A.3d at 260. Therefore, the Board's legal determination that Claimant voluntarily quit his employment and, consequently, was ineligible for benefits under Section 402(b) was in error. As Employer did not assert any other basis for Claimant being ineligible for UC benefits, we reverse.[10]

_____
**RENÉE COHN JUBELIRER,** Judge

---

[10] Based on our disposition, we need not address Claimant's other allegations of error.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

David E. Stout,                              :
                    Petitioner              :
                                            :
            v.                              :     No. 426 C.D. 2021
                                            :
Unemployment Compensation                   :
Board of Review,                            :
                    Respondent              :

# **O R D E R**

    **NOW**, March 21, 2022, the Order of the Unemployment Compensation Board of Review, dated March 23, 2021, is hereby **REVERSED**.

                                                      _____

                                                  **RENÉE COHN JUBELIRER,** Judge